**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-87(1) (TJK)** |
| | : | |
| | : | |
| **MICHAEL SPARKS,** | : | |
| | : | |
| **Defendant.** | : | |


**SENTENCING MEMORANDUM OF**
**DEFENDANT MICHAEL SPARKS**


**May it please the Court:**

**Summary of Argument**

For the reasons set forth below, the Court should conclude that the remaining charges herein comprise a single group for sentencing purposes and that an enhancement for obstruction of justice is not appropriate. This would make defendant's total offense level 10 and his criminal history category I for an advisory guideline sentencing range of six to twelve months, Zone B. The Court should sentence defendant to a total term of twelve months home incarceration followed by a three year term of supervised release.

A sentence of twelve months home incarceration followed by a three year term of supervised release with the special conditions recommended herein and the standard strict controls, conditions, and sanctions attendant to supervised release will be sufficient but not greater than necessary to satisfy the requirements of the Sentencing Reform Act. Such

a sentence will provide defendant with effective correctional treatment; deter like-minded individuals from committing similar crimes; protect the public from further criminal conduct of the defendant; and constitute just punishment for his offenses. A sentence of imprisonment will not satisfy the statutory purposes of sentencing to any greater degree. Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirements of the 18 U.S.C. §3553(a)(2).

Mr. Sparks has no prior felony or serious misdemeanor convictions, has never been in jail, has never had the benefit of competent supervision before being placed on federal pretrial release, and has proven by his conduct while on both pretrial release and release pending sentencing that he can and will conform to the remedial and supervisory aspects and requirements of supervised release.

### The Charges of Conviction

Defendant was convicted of two felony and four misdemeanor counts arising out of his participation in demonstrations at the Capitol on January 6, 2021, during a joint session of Congress to certify the vote count of the Electoral College for the 2020 Presidential election, specifically Obstruction of an Official Proceeding in violation of 18 U.S.C. §§1512(c)(2) and 2; Civil Disorder in violation of 18 U.S.C. §§231(a)(3) and 2; Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. §1752(a)(1); Disorderly or Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. §1752(a)(2); Disorderly or Disruptive Conduct in a Capitol

Building in violation of 40 U.S.C. §5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. §5104(e)(2)(G).

On motion of the United States, the Court dismissed the obstruction of Congress count in light of <u>Fischer v. United States</u>, ___ U.S. ___, 144 S.Ct. 217 (1924). The other counts of conviction remain.

### The Statutory Penalties

The §231(a)(3) charge carries, a maximum sentence of 5 years imprisonment; each of the §1752 charges, a maximum sentence of 1 year imprisonment; and each of the §5104 charges, a maximum sentence of six months imprisonment. In addition, a total term of supervised release not exceeding three years may be imposed.

### The Underlying Facts

Following the defeat of Donald Trump in the 2020 presidential elections, he, his acolytes, and complicit members of Congress and the media commenced a disingenuous but effective campaign to convince his followers—of which Mr. Sparks was and remains one—that the election had been illegally stolen from them. Trump set about to prevent the certification of President Biden's election by the Electoral College on January 6, 2021, through efforts viewed very differently by many Americans through the partisan lens of the times. Those who supported President Biden saw frivolous legal challenges, entreaties to state election officials to illegally alter vote totals; 147 Republican members of Congress voting to illegitimately overturn the election results; and improper pressure on Vice President Pence to forsake his ministerial duty and unconstitutionally refuse to

3

accept and recognize the properly certified electoral ballots of the states. Trump's supporters saw legitimate court challenges, incorrect state vote totals that needed to be corrected, members of Congress acting in good faith, and a duty on Vice President Pence's part to invalidate the electoral votes of several states that had voted for President Biden. That bifurcated view remains to this day and is just as fervently held as it was then.

As part of his campaign to prevent certification of the electoral vote by Congress, Trump called upon his followers to come to Washington, D.C., to—as he put it—"stop the steal". Mr. Sparks believed his president and traveled to Washington, D.C., on January 6, 2021, to protest what he had been told was a stolen election—not by engaging in physical violence against police or members of Congress, but by supporting, encouraging, and enabling what he had been told and in good faith believed was Vice President Pence's constitutional duty to reverse the election results and declare Trump president. This is evident from Government's Exhibit No. 263 in which Mr. Sparks stated his intent and his reason for attending the protest.


Excerpt #1 U.S. Exhibit No. 263


Excerpt #2 U.S. Exhibit No. 263



Excerpt #3 U.S. Exhibit No. 263



Excerpt #4 U.S. Exhibit No. 263

As the protest grew, the crowd—at Trump's behest—eventually made its way to the Capitol itself and gained entry to the building. The government and media tout Mr. Sparks as the "first to enter the building". While technically true in a time-line sense, he did not lead the crowd into the building or cause the breach through which he and others entered. Actually, there were eight different points of access that day separately and independently exploited by the protestors. (Defendant's Exhibit No. 2).



One of these was the on the west side of the Capitol at the Senate Wing Door where Mr. Sparks entered the building at 2:13 p.m. through a window broken out, not by Mr. Sparks, but by Dominic Pezzola, a member of The Proud Boys terrorist group.





Pezzola Breaking out window



Defendant later climbing through window

What is important in this case, however, is not *when* or *how* Mr. Sparks entered the Capitol. It is how long he was there and what he did while inside. In this regard, he is among the less culpable offenders in the Capitol breach. Upon entering the building at 2:13 p.m., he made his way to the Ohio Clock Corridor where he verbally confronted and argued his view with police for approximately eight minutes. When it became evident to him that Vice President Pence was not, in fact, going to declare Trump president as Trump had assured his followers that he would, Mr. Sparks literally quit the protest and walked away at 2:26 p.m. He re-entered the Senate Wing Door at 2:28 p.m., and peacefully left the Capitol at 2:33 p.m—20 minutes after he entered. While other protestors became more and more enraged and lingered for hours fighting and attacking police, engaging in violence and destruction, invading Congressional offices, terrorizing staff, and even entering the Senate and House chambers themselves, Mr. Sparks stood

7

outside the building passively observing matters.



2:13 p.m.



2:18 p.m.



2:26 pm



2:28 p.m.



2:30 p.m.



2:33 p.m.



After 2:33 p.m. (U.S. Exhibit 251)

While this narrative generally tracks the offense conduct detailed in the preliminary presentence report (DN 121 Preliminary Presentence Report [hereinafter referred to as PSR]), four aspects of the PSR's rendition of facts are in error and require comment: 1) the interaction between Mr. Sparks and Officer Eugene Goodman (PSR ¶¶35-36); 2) whether Mr. Sparks was one of those demanding to know the location of the vote counting (PSR ¶35); 3) whether he obstructed justice by deleting certain texts from his cellular telephone (PSR ¶42); and 4) whether he was the person in Government's Exhibit No. 263 who proclaimed "all it's gonna take is one person to go. The rest is following." (PSR ¶29).

### 1. Mr. Sparks and Officer Goodman

The PSR states that Mr. Sparks and others *chased* Officer Eugene Goodman. (PSR ¶36). This is belied by Officer Goodman's own testimony in this and other trials that he

intentionally *led* the group of protestors to where he knew a police line had been set up in the Ohio Clock Corridor so that the group could be contained and controlled, which it was. While Mr. Sparks was in that group led by Officer Goodman to the Ohio Clock Corridor and verbally argued with Officer Goodman for some eight minutes before leaving the building, he never assaulted or threatened him or any other officer. Indeed, at one point, he actually protected Officer Goodman from physical assault by another protestor.

This is all corroborated by the government's own evidence (see still excerpts from Government Exhibit No. 108 below) and Officer Eugene Goodman himself.



Excerpt from Government Exhibit No. 108



Excerpt from Government Exhibit No. 108

Officer Goodman was interviewed by the FBI just 10 days after the events of January 6, 2021, when events were still fresh in his mind. He told the agents that, unlike others in the group, Mr. Sparks (whom he identified as "UNM1") had not behaved in a threatening or assaultive manner and did not "concern" him. The FD-302 of the January 16, 2024, interview confirms this.

> Though it was very loud, GOODMAN did not believe UNMl was acting in a threatening manner, rather GOODMAN recalled UNMl making the following statements, "This is our house. I'm with you. I support police officers. You need to join us on this side." In fact, GOODMAN recalled that UNMl kept trying to "fist bump" him in solidarity. Many of the statements coming from the rest of the group were political in nature.

> GOODMAN did not believe many people in the group were trying to hurt him. It appeared as though most of the group merely wanted to get around him. GOODMAN tried to keep the group in front of him until help came or until he could get to help.

13

There were three individuals in the group that concerned GOODMAN the most. The first individual was the male in the front of the video wearing a beanie hat and a black shirt with the letter "Q".[1] The second individual was the male who had his face painted, was wearing horns, and was carrying what appeared to be a spear.[2] The third individual was a male who was carrying a confederate flag and appeared to have tear drops either painted or tattooed on his person.[3]

(FD-302 Eugene Goodman, January 16, 2021 (attached hereto with included photos as Exhibit A)). The agent notes of the interview with Officer Goodman corroborate the FD-302 and make clear that Mr. Sparks was not aggressive toward him. (Interview Notes Eugene Goodman, January 16, 2021 (attached hereto as Exhibit B)).

2. "Where are they counting the f** votes?"

Contrary to unsubstantiated claims in the PSR, Mr. Sparks at no time joined in the chant of others in the crowd "where are they counting the f** votes". (PSR ¶35). He did not want to stop a process that he truly believed would result in Trump being declared the winner by Vice President Pence, as Trump had assured him and everyone else that he should and would. When it became obvious that the Vice President was not going to do that, Mr. Sparks did not go on a rampage to invade the House and Senate floors and attack police and members of Congress as did so many others—including his co-defendant, Joseph Howe, who attacked and injured several police officers and destroyed property. Instead, Mr. Sparks just peacefully left the building and passively watched events from outside the Capitol.

---

[1] Identified at trial as Douglas Austin Jennings
[2] Identified at trial as Jacob Chansley
[3] Identified at trial as Kevin Seefried

14

Video and testimonial evidence from the trial fail to link Mr. Sparks to the chanting or support the unfounded conclusion of PSR ¶35. The aforementioned FBI agent's notes of the interview with Officer Goodman, who was right there at the time, omitted any reference to Mr. Sparks being a part of the chanting.

> did man say anything specifically (recall?) very loud but remembered "This is our house. I'm w/ you" "I support POS (sic)" "you need to join us on this side."

(Exhibit B). Officer Goodman was interviewed by the FBI again on September 16, 2022, and "did not provide additional new information which had not been documented during previous interviews regarding the events of January 6, 2021." (FD-302 Eugene Goodman, September 16, 2022 (attached hereto as Exhibit C)). Officer Goodman did not change his story until January 10, 2024—less than a month before trial—when, no doubt at the urging of prosecutors, he embellished his prior statements to—*for the first time in the three year interim*—allege that Mr. Sparks himself had said "Where are they counting the votes?" (FD-302 Eugene Goodman, January 10, 2024 (attached hereto as Exhibit D)). Defense counsel challenged this convenient eve-of-trial change in testimony on Officer Goodman's part and made clear to prosecutors his intention to impeach the Officer on the issue with his prior statements. Significantly, Officer Goodman did <u>*not*</u> so testify at trial. Rather, his trial testimony closely tracked his prior statements to the FBI. *In short, there is no evidence that Mr. Sparks joined in the chant.*

But some persons were demanding to know. If it was not Mr. Sparks, then who? According to exhibits and testimony by Officer Goodman and Deputy Chief Loyd in this

and other trials, it was Douglas Jensen, Kevin Seefried, and an unnamed man in a red hat. Neither witness ever linked Mr. Sparks to the chanting and no video or photographic evidence at this or any of the other January 6 trials show him engaging in it.



Jensen, Seefried, and "man in the red hat" demanding to know location of vote



Government Exhibit No. 504 from U.S. v. Jensen (a wider angle)

16



Government Exhibit No. 505 from <u>U.S. v. Jensen (a different perspective)</u>

### 3.   Deleted Text Messages

The government and the PSR claim that on January 19, 2021, Mr. Sparks closed his Facebook account and that before surrendering his cellular telephone to authorities in mid-January, 2021, he deleted from the device certain text messages received from the co-defendant, Joseph Howe, "days before January 6, 2021". Without the first shred of evidence to support it, the government and the PSR speculate that the deleted materials "would have provided evidence of their joint planning for the events of January 6 and their efforts to interfere with the certification of the 2020 election results". (PSR  42). Mr. Sparks states that he and Joseph Howe have been good friends for 12 years and that the messages could have been about work, hunting, or anything. He denies any motive to

obstruct justice. Rather, he constantly and routinely deletes emails and messages—as do most people—to prevent them building up on his phone. He closed his Facebook account altogether on January 19, 2021, due to the deluge of harassment and threats he, his wife, and family were receiving.

### 4. Identity of Speaker in Government's Exhibit No. 263

Government's Exhibit No. 263 is a third party video showing Mr. Sparks, Mr. Howe, and a group of other unknown individuals walking toward the Capitol on January 6, 2021. In it, the government itself provided subtitles of who said what. While several statements are correctly attributed to either Mr. Sparks or Mr. Howe, the statement "All it's gonna take is one person to go. The rest is following." is attributed to neither, but to an "Unknown Male". The conclusion of PSR ¶29 that it was Mr. Sparks who uttered the statement is unsupported by the evidence admitted at trial.



Government's Exhibit No. 263

### The Presentence Report Guideline Calculations

The preliminary PSR assesses a total offense level of 18 and a criminal history category of I. This results in an advisory guideline range of 27 to 33 months, Zone D. However, this calculation is obviously no longer accurate due to the dismissal by the Court of the 18 U.S.C. §1512(c)(2) charge in light of <u>Fischer v. United States</u>, ___ U.S. ___, 144 S.Ct. 2176 (1924). This sentencing memorandum is based on the assumption that the final PSR, yet to be filed, will differ from the preliminary PSR only with regard to the dismissal of the §1512(c)(2) charge. If the final PSR makes additional changes, counsel has requested leave to submit a supplementary memorandum.

Based on positions taken by the probation officer in the preliminary PSR, the final PSR will presumably divide the remaining charges into two groups: Group 1 consisting of the two §1752(a) counts, and Group 2 consisting of the §231 count. (PSR ¶¶61-63). The final PSR will most likely conclude that the base offense level for Group 1 is 10 pursuant to U.S.S.G. §2B2.3 and assess—as it does in the preliminary PSR—a two level enhancement pursuant to U.S.S.G. §3C1.1 on grounds that the defendant "deleted text messages and deactivated and permanently deleted his Facebook account", making the adjusted offense level for that group 12. (PSR ¶¶64, 68-69). The preliminary PSR calculations regarding the §231 count will presumably remain unchanged, concluding that the base offense level for Group 2 is 10 pursuant to U.S.S.G. §2A2.4(a) and assessing the same §3C1.1 two level obstruction of justice enhancement, making the adjusted offense level for that group 12. (PSR ¶¶70, 74-75). Two grouping levels are

added, making the recommended total offense level for the whole case 14. (PSR ¶¶76-79, 83).

Defendant has 0 criminal history points and is deemed a criminal history category I. (PSR ¶¶84-87)).

A total offense level of 14 and a criminal history category of I would result in an advisory guideline sentencing range of 15 to 21 months, Zone D.

## Objections to the Presentence Report

In DN 124, defendant timely filed two objections to the guideline calculations of the preliminary PSR: 1) contrary to PSR ¶¶61-63, 76, and 78-79, all of the remaining charges should group together for sentencing purposes, so there should be no §3D1.4 grouping enhancement; and 2) contrary to PSR ¶¶47-48, 68, and 74, defendant should not be assessed a §3C1.1 enhancement for obstruction of justice. Defendant addresses each objection separately below.

## Grouping

The PSR errs in not grouping all counts together in this case. They involve the same victim and the same harm.

The common thread that runs through 18 U.S.C. §§231(a)(3), 1752(a)(1) and 1752(a)(2) is interference with governmental functions. In the case of §231(a)(3) it is obstructing, delaying, or adversely affecting "the conduct or performance of any federally protected function". In the case of §1752 it is doing an act "with intent to impede or disrupt the orderly conduct of Government business or official functions" that "in fact,

impedes or disrupts the orderly conduct of Government business or official functions". All three charges plainly constitute a common harm i.e., interference with government functions, with a common victim, i.e., government itself.

One need look no further than the sentencing of the much more culpable co-defendant in this very case, Joseph Howe, to see that the PSR applies a double standard to Mr. Sparks' sentencing when it comes to application of the grouping rules of U.S.S.G. §3D1.2. Mr. Howe was convicted in this case of obstructing Congress in violation of 18 U.S.C. §1512(c)(2) and for physically assaulting several Capitol police officers in violation of 18 U.S.C. §111(a)(1) by "engaging in repeated physical attacks on officers throughout the Capitol, including at least one that involved a dangerous chemical and another that caused a head injury to a police officer". (Government's Sentencing Memorandum, DN 75, p. 23). Clearly, these were charges that *did* involve separate harms and separate victims, unlike Mr. Sparks' charges. If this Court had applied the same standard to Mr. Howe as the PSR and the government are seeking to apply to Mr. Sparks, Howe's charges would have constituted two groups under U.S.S.G. §3D1.2, with government being the victim in the §1512(c)(2) charge and individual police officers the victims of the §111(a)(1) charge. *But it did not.* Although counsel is not privy to the PSR in Mr. Howe's case, it is clear from the record that the government did not seek and the Court did not apply any grouping enhancement in Mr. Howe's sentencing even though his conduct was far more egregious than Mr. Sparks' and presented a much more arguable case for separate grouping under §3D1.2.

21

Mr. Howe's case is not an outlier. Mr. Sparks' case is. For example, in its sentencing memorandum in Mr. Howe's case (DN 75), the United States cites four cases all involving §1512(c)(2) and §111(a)(1) charges as examples for the Court to follow in determining the appropriate sentence for Mr. Howe in this case: United States v. Jensen, No. 21-cr-6 (TJK); United States v. Shalvey, No.21-cr-334 (TJK); United States v. Sandlin, No. 21-cr-88 (DLF); and United States v. Palmer, No. 21-cr-328 (TSC). (DN 75, pp. 22-24). Each case was more serious than Mr. Sparks' case and involved more egregious conduct. Each case involved direct assaults on individual police officers, some with weapons or dangerous chemicals. In none of these cases—*none, not a single one*— did the government seek or the Court apply a grouping enhancement.

What about other cases involving §1512(c)(2) and §231(a)(3) charges like Mr. Sparks'? The pattern of disparity is the same. See, for example, the analogous case of United States v. Bisignano, No. 21-cr-036 (CJN) where a §231 civil disorder charge, a §1752(a)(1) trespass charge, a §1752(a)(2) disorderly conduct charge, and a §1752(a)(4) property damage charge were apparently all grouped together into a single group for sentencing purposes.  See also, United States v. Rubenacker, No. 1:21-cr-00193 (BAH) where a §1512(c)(2) obstruction of Congress charge, a §231(a)(3) civil disorder charge, and a §111(a)(1) assault charge were apparently all grouped together into a single group for sentencing purposes.[4]

---

[4] Again, counsel is not privy to the sealed PSRs in these cases, but it is evident from the record in all of them that the government did not seek and the Court did not apply a grouping enhancement.

Then there is the issue of 18 U.S.C. §3553(a)(6) which prohibits "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Here, Mr. Howe's conduct was substantially more egregious than Mr. Sparks' but a more lenient grouping calculation was used in his case. While it is true Mr. Howe entered pleas of guilty and Mr. Sparks exercised his right to trial, that is hardly a valid distinction justifying applying two different grouping standards. The federal sentencing guidelines may reward defendants who waive their constitutional right to trial, but they do not permit punishing those that do not.

### Obstruction of Justice

U.S.S.G. §3C1.1 provides for a two level enhancement in cases where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice". The commentary makes clear that the heartland of the obstruction enhancement is conduct that was "purposely calculated, and *likely*, to thwart the investigation or prosecution". (Emphasis added). In this case, the PSR cites Mr. Sparks' deletion of certain "text messages" sent to him by the co-defendant, Howe, and his permanent closing of his Facebook account on January 19, 2021. (PSR ¶¶42, 68, 74).

The sole evidence for this assertion is defendant's closing of his Facebook account on January 19, 2021 and Government's Exhibit No. 427 which listed text messages purportedly deleted from Mr. Sparks' cellular telephone. Neither the government nor the PSR identify anything actually deleted from defendant's Facebook account other than his closing of the entire account. The text messages allegedly deleted had been sent to Mr.

Sparks by Mr. Howe at 7:38 p.m. on December 19, 2020; 9:22 p.m. on December 20, 2020; 6:51 p.m. on January 3, 2021; 10:06 p.m. and 7:01 p.m. on January 8, 2021; 1:32 p.m. on January 11, 2021; and 10:27 p.m. and 1:20 p.m. on January 22, 2021. Again, none of the deleted messages are alleged to have been sent by Mr. Sparks. Nothing was apparently recovered from Mr. Howe's phone or other sources, e,g., his Facebook account, his cellular carriers, his computer, etc.

Significantly, neither the PSR nor the government provide any evidence whatsoever as to the nature or content of the allegedly deleted material and how that alleged deletion was "likely to thwart the investigation or prosecution of this case." The government and the PSR speculate—that's the only word for it—that "[t]he text messages would have provided evidence of their joint planning for the events of January 6 and their efforts to interfere with the certification of the 2020 election results." (PSR ¶42). What evidence, exactly? How does the government know that? What did the text messages say? What was deleted by Facebook when the account was closed? How did the alleged deletions "thwart" the investigation and prosecution of Mr. Sparks? In order to invoke the §3C1.1 enhancement, the burden is on the government to prove what the deleted items were, that they were material, and that their deletion thwarted the investigation and prosecution. The burden is *not* on the defendant to prove the contrary. Without knowing the content, then, the government cannot carry its burden.

Compare Mr. Sparks' case to another of the cases embraced and cited as a model sentencing example by the United States in its sentencing memorandum in Mr. Howe's

case (DN 75, pp. 23-24): <u>United States v. Sandlin</u>, No. 21-cr-88 (DLF). In <u>Sandlin</u>, the government sought and the PSR and Court applied the two level enhancement for obstruction of justice under U.S.S.G. §3C1.1 for Sandlin deleting "[from] his Facebook account the group chat with Defendant De[G]rave and Colt, which contained photographs and messages regarding the events of January 6, 2021." (<u>U.S. v. Sandlin</u>, No. 21-cr-88 (DLF), DN 92, p. 26). Sandlin also encrypted video footage in an effort to prevent access by the authorities, thus effectively deleting it. The government carried its burden under U.S.S.G. §3C1.1 in the <u>Sandlin</u> case by showing what the deleted or encrypted messages and videos contained and that they were both relevant and inculpatory.

> [T]his group chat was replete with evidence of the defendants' conspiracy—i.e., the count of the Section 1512(k) conviction—including messages regarding the weapons and gear they planned to bring to Washington, D.C. on January 6 and their reasons for doing so.

(<u>Id.</u>). How did the government know what evidence was in Sandlin's deleted and encrypted chats and footage? It was known because the deleted material was later forensically recovered from Sandlin's seized laptop and investigators were ultimately able to obtain Sandlin's encryption key for the videos from another source.

> Although the government ultimately was able to recover these videos from Sandlin's seized laptop, it was only after Sandlin engaged in further obstructive methods to hide material evidence from law enforcement detection. Specifically, he encrypted his video footage of the Capitol on his laptop prior to his arrest and then gave a copy to a third party, who later attempted to watermark the footage for sale to media outlets. The government was only able to access the files, including the video capturing his assaults on police, in January 2022—an entire year after the crime— after Sandlin provided his encryption key to the third party in a recorded jail call.

(Id., at p. 27).

In Mr. Sparks' case—unlike in Mr. Sandlin's case—the government does not have the first scrap of evidence regarding the contents of the allegedly deleted texts and accounts. Without knowing their contents, it is not possible to conclude—even under a preponderance standard—what the motive for the alleged deletion was or whether that material was even relevant to the criminal investigation, let alone that the deletion thwarted justice or was intended to do so. Without this, the enhancement must be denied.

### The Appropriate Guideline Calculation

Without the disputed §3D1.2 grouping enhancement and §3C1.2 obstruction of justice enhancement, the appropriate guideline calculation should be as follows:

Count Two, 18 U.S.C. §231:
| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base offense level | 10 |
| | Sub-total | 10 |

Count Ten, 18 U.S.C. §1752(a)(1):
| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base offense level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A) | Restricted building or grounds | +2 |
| | Sub-total | 6 |

Count Eleven, 18 U.S.C. §1752(a)(2):
| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base offense level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A) | Restricted building or grounds | +2 |
| | Sub-total | 6 |

**Highest Offense Level:**                                             **10**

**Criminal History Category**                                         **I**

Accordingly, defendant's total offense level should be 10, not 14 as recommended by the PSR. All agree that his criminal history category is I. A total offense level of 10 and a

criminal history category of I results in an advisory guideline sentencing range of 6 to 12 months, Zone B. For the reasons set forth above, this is the appropriate advisory guideline range, not the range of 15 to 27 months, Zone D, recommended by the PSR based on its incorrect guideline calculation.

## Determining the Appropriate Sentence

Whatever advisory sentencing range the Court deems appropriate under the Federal Sentencing Guidelines, that range is only one of the many sentencing factors to be considered by the Court in crafting an appropriate sentence.

The Sentencing Reform Act, 18 U.S.C. §3553, *not* the Federal Sentencing Guidelines, control sentencing. While 18 U.S.C. §3553(a)(4) requires the Court to *consider* the guidelines in imposing sentence, the guidelines must not be treated as mandatory or even presumptively correct. Gall v. United States, 552 U.S. 38, 49, 51 (2007);  Nelson v. United States, 555 U.S. 350, 352 (2009). Under 18 U.S.C. §3553(a), the *advisory* guideline sentencing range is only "one factor among several" to be considered in imposing an appropriate sentence. Kimbrough v. United States, 552 U.S. 85, 90 (2007). The other co-equal factors a sentencing court must consider in addition to the guidelines are the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. §3553(a)(1)) and the need of the sentence to 1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 2) to afford adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the defendant; and 4) to provide the defendant

with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2). The Court must "consider all of the §3553(a) factors", "make an individualized assessment based on the facts presented", <u>Gall</u>, 552 U.S. at 49-50, and explain how the facts relate to the statutory purposes of sentencing. <u>Id</u>., at 53-60; <u>Pepper v. United States</u>, 562 U.S. 476, 491- 494 (2011).

In determining what sentence should be imposed for crime, prosecutors, probation officers, and the guidelines themselves focus almost exclusively on just one of the many §3553(a)(2) factors—punishment—to the exclusion of all of the others. But in enacting the Sentencing Reform Act, Congress did "not favor [ ] one purpose of sentencing over another". *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case". <u>Id</u>., at 68. In choosing what kind of sentence to impose, the Court "must consider" all of the purposes and factors set forth in §3553(a), not just punishment or the advisory guideline sentence. <u>Id</u>., at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." <u>Id</u>. Presumably, that directive applies to determining the length and type of a sentence as well.

After considering <u>all</u> of the factors set forth in §3553(a)—not just the advisory Federal Sentencing Guidelines—the Court must impose a sentence that is "sufficient but not greater than necessary" to satisfy <u>all</u> of the statutory purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation of the defendant in the

most effective manner. 18 U.S.C. §3553(a). This so-called "parsimony provision" represents the "overarching" command of the Sentencing Reform Act. <u>Kimbrough</u>, 552 U.S., at 101.

### Nature and Circumstances of the Offense and History and Characteristics of the Defendant (PSR ¶¶13-14, 95-127; DN 131)

As discussed above, federal sentencing stands on two pillars—consideration of the statutory sentencing factors of 18 U.S.C. §3553(a)(2) to be sure, but also the equally important consideration of the nature and circumstances of the offense and the history and characteristics of the defendant as required by 18 U.S.C. §3553(a)(1).

Mr. Sparks is 47 years old, has lived in Hardin County, Kentucky, with his family and relatives his entire life. He is married and has three children, six year old twin boys and a 28 year old daughter, as well as a 19 year old step daughter. He is a care giver for his ailing mother and a longtime member of the Franklin Crossroads Baptist Church in Cecilia, Kentucky, where he teaches Sunday school for middle school students and men's ministry classes. His only criminal conviction is a 27 year old misdemeanor underage DUI conviction when he was 20 years old. (PSR 85). He has never been incarcerated.

Mr. Sparks is in good health with no history of mental or emotional problems. He does not abuse drugs or alcohol, confirmed by a drug test administered by the U.S. Probation Office on May 24, 2024. He has a high school diploma and had been employed as a Group Leader at Altec in Elizabethtown, Kentucky, from 2012 to 2022, earning between $80,000 and $100,000 per year. Unfortunately, he lost his job due to the

negative media attention the current case caused in the community. He started his own land management business in 2022 and works approximately 50 hours per week.

Defendant was released on his own recognizance at the time of his arrest on January 19, 2021, and has remained so. He has been compliant with his release conditions, showing that he will be compliant with any conditions of home incarceration and supervised release as well.

Mr. Sparks' statement as well as 32 letters from family, friends, and acquaintances who know him best have been filed with the Court at DN 131-1. Counsel commends their reading to the Court. They paint a much different picture of Mr. Sparks than the one portrayed at trial. It is a picture of someone who went to Washington "in support of Trump and honestly thought Mike Pence would send the electors back to be investigated further to make sure the people's vote counted" and "was so sure that Pence was going to do that and . . . wanted to be there to witness it." (Michael Sparks at DN 131-1, p. 5.)

> Before the speech I had zero idea of ever walking to the building. When Trump said we were going to peacefully and patriotically go up to the Capitol and let our voice be heard that was the very first time it ever entered my brain. I wanted my voice to be heard in unison with the thousands of good people around me. . . . In my mind in that moment I thought the closer I can get the better and as I went further I thought you know it would be best to just plead my case face to face. Looking back that was never going to happen. I made sure as I was protesting to make sure to have a level of respect for all involved. That's the reason for zero curse words, don't touch anybody, always be protective and make my voice heard.

(Michael Sparks at DN 131-1, pp.5-6). This is borne out in the evidence introduced at trial, e.g., the video of Mr. Sparks walking to the Capitol stating his expectations and motives to support Vice President Pence; the lack of any assaultive behavior or

aggressive actions or language on his part; his brief 20 minute presence in the Capitol during which he "made his voice heard" to Officer Goodman for a mere eight minutes and then peacefully and voluntarily left the building to passively watch from outside while the rampage and violence initiated and engaged in by others escalated and spread inside. Does this make Mr. Sparks less guilty of trespass or civil disorder? No. But it does serve to properly place his conduct within the spectrum of culpability applicable to January 6 cases. And it is lower than most who entered the building that day.

These letters also reveal characteristics of the defendant not relevant to trial, but central to the issue of sentencing. It is of a selfless man who does not hesitate to help strangers in their time of need wherever and whenever he encounters them, be it in his home town, across the state in Eastern Kentucky, or a foreign country; a kind man; a religious man for whom his faith is sincere and not mere window dressing; a good father to his wife and children and son to his ailing mother; and a productive and contributing member of his community. None of this excuses his conduct, of course, but it shows it to be the aberration that it was.

## The Appropriate Sentence

After considering the history and characteristics of the defendant as required by 18 U.S.C. §3553(a)(1) and the statutory purposes of sentencing as required by 18 U.S.C. §3553(a)(2), the Court should impose a sentence of twelve months home detention followed by a three year term of supervised release. This sentence is at the top of the correct advisory guideline range for a total offense level of 10 and a criminal history

category of I. This sentence, with all of the stringent requirements, controls, monitoring, and sanctions supervised release entails; the conditions of supervision recommended by the probation officer (PSR ¶¶167-171); as well as any other conditions the Court should deem appropriate, will be sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. §3553(a)(2). Such a sentence will provide defendant with effective treatment; deter like minded individuals from committing similar crimes; protect the public from further criminal conduct of the defendant; and constitute just punishment for his offenses.

### A. The Recommended Sentence Will Provide Defendant with Needed Correctional Treatment in the Most Effective Manner.

Everyone is familiar with the benefits of the remedial and correctional treatment programs of the Bureau of Prisons. However, Mr. Sparks should not and need not be incarcerated in order to avail himself of such benefits because all of these benefits are also available in the non-custodial setting of home incarceration and supervised release. In fact, the Sentencing Reform Act specifically prohibits imposing a custodial sentence just for the purpose of availing a defendant of the Bureau of Prisons' custodial remedial and correctional treatment programs.

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. §3582(a) (emphasis added). In short, Mr. Sparks should not be incarcerated just so he may benefit from any remedial or correctional treatment or program of the

Bureau of Prisons. *Indeed, there is no need to do so.* Any treatment or rehabilitation the Court feels is indicated in Mr. Sparks' case can be obtained under the auspices and supervision of the United States Probation Office while he serves his twelve month term of home incarceration and his three year term of supervised release.

A custodial sentence of any length—let alone the 15 to 21 month term recommended by the PSR and the United States—will provide no greater amount of "needed educational or vocational training, medical care, or other correctional treatment" than a sentence of twelve months home incarceration and three years of supervised release. Accordingly, that recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(D).

### B. The Recommended Sentence Will Protect the Public from Further Crimes of the Defendant.

A common mantra from the government is that only incarceration can protect the public from further crimes by this or any defendant. This is not true in Mr. Sparks' case.

First, the Sentencing Commission itself deems Mr. Sparks to be a low risk of re-offending. He is a criminal history category I. What does that mean? The Sentencing Commission's criminal history category is not just an arbitrary ranking system pulled out of thin air. Rather, the purpose and methodology of the Sentencing Commission's criminal history category calculation are to accurately assess the true seriousness of a defendant's criminal history and, more importantly, *the likelihood that he or she will commit other crimes in the future*.

To protect the public from further crimes of the particular defendant, the

likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.

U.S.S.C. Guidelines Manual, Chapter Four-Criminal History and Criminal Livelihood, Part A-Criminal History, Introductory Commentary. The factors relied upon by the Commission for the assignment of criminal history points to a particular conviction (i.e., the nature of the offense, the severity of the sentence, and the length of time that has passed since the conviction or release from imprisonment) and the aggregation of those points into a criminal history category for sentencing purposes are not arbitrary. They are based on "extant empirical research assessing correlates of recidivism and patterns of career criminal behavior". (Id.). Applying this "extant and empirical research", the Sentencing Commission deems those in criminal history category I—and thus Mr. Sparks—to be the lowest risk of re-offending.

However, the Court need not rely merely upon the Sentencing Commission's "predictions" of Mr. Sparks' low risk of recidivism in order to reasonably insure that the public is protected from future criminal conduct by him. His twelve months of home incarceration and his three year term of supervised release will carry stringent requirements, controls, monitoring, and sanctions which will actively serve to prevent any further criminal activity on pain of lengthy terms of imprisonment should he violate any of the terms of that supervised release. U.S.S.G. §§5D1.3, 7B1.1-7B1.5. The Court may and should also impose *any* additional special conditions of supervised release it deems necessary to further protect the public, such as any needed drug and alcohol

34

treatment, therapy, and counseling or psychological or psychiatric treatment asdeemed appropriate and approved by the Probation Office. U.S.S.G. §§5D1.3(b) and (d). The important thing here is that Mr. Sparks has a track record. For 43 months he has proven his ability and motivation to comply with such conditions and will continue to do so while on supervised release.

The defendant has no prior felony or serious misdemeanor convictions, has never been in jail, has never had the remedial benefit of competent treatment and counseling, and has proven by his conduct for the past 43 months that he can conform to the remedial aspects and requirements of supervised release. The Court should not assume—without even trying—that terms of home detention and supervised release will fail to protect the public and that custodial incarceration is necessary. Defendant asks that he at least be given the opportunity to succeed, as supervised release supervision is intended to do.

A custodial sentence of any length—let alone a 15 to 21 month term as recommended by the PSR and the United States—will not protect the public to a greater degree than a sentence of twelve months home incarceration followed by three years of supervised release. Accordingly, the recommended sentence will be sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. §3553(a)(2)(C).

### C. The Recommended Sentence Will Afford Adequate Deterrence to Criminal Conduct by Others.

Deterrence is the most difficult of the §3553(a)(2) factors to quantify or assess. The government routinely argues—without empirical support—that longer custodial sentences equate to stronger deterrence. Numerous scientific studies have confirmed that

longer sentences do <u>not</u> deter crime to a greater degree than shorter sentences. It is the certainty of detection and conviction that deters crime, not the length of any threatened sentence. Even if we eschew the criminological research, conventional wisdom validates this fact. The threat of high fines or even jail time for speeding or reckless driving deters no one from engaging in such behavior. But, everyone slows down and drives appropriately when they see a police car on the side of the road. It is not the threat of a severe sanction that deters us, it is the certainty of detection and conviction that does.

> Research to date generally indicates that increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits.
> . . . .
>
> Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment. . . .

Valerie Wright, Ph.D., <u>Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment</u>, pp. 1,4 (found at *http://www.antoniocasella.eu/nume/Wright_2010.pdf*). (Emphasis in the original). The study concluded that

> [e]xisting evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive. Overall, the evidence indicates that the deterrent effect of lengthy prison sentences would not be substantially diminished if punishments were reduced from their current levels.

<u>Id</u>., at p. 9.

If the January 6 investigations and prosecutions—especially this one—have proven anything, it is that illegal, disorderly protests on government property cannot be

committed with anonymity or impunity. All now know with certainty that such conduct will be aggressively investigated and the perpetrators identified, arrested, tried, and convicted. It is this "certainty" of punishment rather than the potential "severity" of punishment that will serve to deter others from conduct similar to the events of January 6. For those who are not so deterred because they do not care about the consequences or believe—despite the ample evidence to the contrary—that they will ever be identified, caught, and prosecuted, no sentence, no matter how severe, will have any greater deterrent effect than the one recommended herein. The ease with which defendant's conduct and identity were uncovered by investigators; his very public arrest, prosecution, and conviction; a sentence of twelve months home incarceration and a three year term of supervised release, with the attendant strict controls and conditions that it entails; plus the potential of additional terms of imprisonment if the conditions of supervised release are violated are powerful deterrents and onerous and serious sanctions that will definitely deter like minded individuals from committing similar crimes.

Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(B).

### D. The Recommended Sentence Will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

While punishment is only one of the §3553 factors to be considered by the Court in imposing sentence, it *is* a factor. However, punishment must be just under the circumstances of the case. A custodial sentence—especially one as harsh as that recommended by the PSR—is excessive for someone with no prior terms of

incarceration, no prior opportunity for treatment to correct his behavior, and no chance to conform his conduct to the requirements of supervised release. And an excessive sentence is not a punishment that is just as required by the statute. Nor does an unjust sentence promote respect for the law. Just the opposite.

Congress specifically contemplated that conduct such as defendant's could be adequately punished by the recommended sentence, otherwise it would have imposed a mandatory minimum term of imprisonment, which it did not. Accordingly, the recommended sentence is within the range of punishment contemplated by Congress and would constitute a just sentence that reflects the seriousness of the crime. Accordingly, the recommended sentence is sufficient, but not greater than necessary, to satisfy the requirement of 18 U.S.C. §3553(a)(2)(A).

## Conclusion

Twelve months home incarceration followed by a three year term of supervised release with the standard strict controls, conditions, and sanctions attendant to supervised release; the usual mandatory and standard conditions imposed by statute and U.S.S.C. §5D1.3; and such other conditions as the Court may deem appropriate will be "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offenses; afford adequate deterrence to criminal conduct by others, protect the public from further crimes of the defendant, and provide him with needed correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2). It is a sentence commensurate with the relative culpability of defendant's

actions on January 6 and takes into account his history and characteristics. 18 U.S.C. §3553(a)(1)

Mike Sparks should *not* escape punishment, but that punishment should be a just punishment, not one that serves only one of the purposes of sentencing to the exclusion of all of the others. Justice and respect for the law are promoted by reasonable sentences, rehabilitation, and the safe return of offenders to society. Mike *can* be redeemed. He is worthy of redemption. The Court should give him that chance by imposing the recommended sentence.

> /s/ Scott T. Wendelsdorf (Ky. Bar No. 75790)
> Federal Defender
> 629 Fourth Avenue
> 200 Theatre Building
> Louisville, Kentucky 40202
> (502) 584-0525
> Scott_Wendelsdorf@fd.org
>
> Counsel for Defendant.

## CERTIFICATE

I hereby certify that on August 14, 2024, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

> /s/ Scott T. Wendelsdorf