# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-87(1) (TJK)** |
| **MICHAEL SPARKS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Michael Sparks to 57 months in custody, three years of supervised release, $2,000 in restitution, and a mandatory special assessment of $170.

## I.     INTRODUCTION

The defendant, Michael Sparks, was the very first rioter to enter the United States Capitol building on January 6, 2021—immediately setting off the forced interruption of the certification of the 2020 Electoral College vote count and threatening the peaceful transfer of power after the 2020 Presidential election. The violent attack on the Capitol injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD

Sparks, then a factory supervisor from Cecilia, Kentucky, led the violent mob which attacked the Capitol in an effort to disrupt the peaceful transition of power on January 6, 2021. When he jumped through the window, ignoring the warnings of the rioters behind him and the pepper spray that hit him squarely in the face, Sparks acted "like a green light for everybody behind him, and everyone followed right behind him because it was like it was okay to go into the building." Trial Tr. 2/28/24 at 117 (Testimony of U.S. Capitol Police Sergeant Victor Nichols). One might say Sparks helped light the fire that day, using his preparation and planning—including his protective body armor—to steel himself against the officers attempting to hold back the mob. For his efforts to impede law enforcement, overturn the election results, and destroy evidence of his crimes, and for his lack of any recognition of the gravity of his role in the offense, Sparks must be sentenced to a significant term of incarceration above what is called for by the Sentencing Guidelines to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a); *see United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up) ("[*United States v.*] *Fischer*[, 144 S. Ct. 2176 (2024),] does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [the defendant's] serious conduct on January 6th, 2021, in its entirety. To reduce [the defendant's] sentence . . . would require this Court to take a drastically different view of [his] conduct."). Accordingly, for the reasons set forth herein, the government requests that this Court depart or vary upwards to sentence Sparks to 57 months of incarceration, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $100 per felony, $25 per Class A misdemeanor, and $10 per Class B misdemeanor.

---

victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the affidavit in support of the Complaint filed in this case, ECF 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol.

### B.     Michael Sparks's Role in the January 6, 2021 Attack on the Capitol

#### *Sparks's Planning for January 6*

As early as November 2020, Sparks began closely following the effort to ensure his preferred Presidential candidate could stay in office, despite the results of the election. He tracked the number of electoral votes tallied for each candidate, and predicted, "Trump will win when all the dust settles." Exh. 304.[2] He began posting theories about election fraud as early as November 5, 2020. Exh. 306. He discussed his displeasure with the results of the 2020 election and his wish to disrupt the peaceful transfer of power, telling a friend "we're going to cry and burn down cities." Exh. 307. He continued to signal, more and more explicitly, that he was prepared to use and condone violence to secure his aims. He suggested that like-minded people should "c[o]me to arms," *id.*, and, on November 8, he posted a picture of Donald Trump with the caption, "Let us know if we need bear arms." Exh. 308. Even by that early date, he began toying with the idea of moving his online discourse to Parler, where he could speak more freely without censors. Exhs. 309, 311. He warned his Facebook friends in a November 17 post, "be prepared because it's going to get ugly." Exh. 312.

Sparks was well aware of the Trump campaign's efforts to persuade the courts that the

---

[2] References to numbered exhibits throughout this memorandum are to the numbered trial exhibits, using the same numbering system. Lettered exhibits were not marked for trial and are attached.

election results were infirm. He followed and circulated news about lawsuits around the country. Exhs. 313, 316. He traveled to D.C. for a political rally on the weekend of December 12, an event he described as "awesome" to his friends. Exh. 318. But he grew increasingly frustrated. He supported calls to seize voting machines, Exh. 322, and demanded, "[d]rag these clowns out of office." Exh. 323.

On December 19, 2020, then-President Trump called on his supporters to come to D.C. for a rally on January 6. The tweet, which specifically referenced election fraud, promised a "[b]ig protest in D.C. on January 6th. Be there, will be wild!" Sparks closely followed the events planned for January 6, including, in particular, the Joint Session of Congress scheduled that day. On November 20, he shared news that Representative Matt Gaetz would "challenge electoral college votes January 6th." Exh. 324. In short, Sparks was educated about the details of the proceedings in Congress on January 6.

As the day approached, Sparks's Facebook posts suggest that he was growing more excited. On Christmas Eve, he posted a photo of then-House Speaker Nancy Pelosi and then-Senate Majority Leader Chuck Schumer with the caption, "How about we the people drag you out by your face." Exh. 325 (see below).



Sparks did indeed join Parler as he promised. The platform is known to be a safer venue for more open discussion about violence and extremism, and Sparks, like other Parler users, likely felt more free to speak openly about his goals and plans. On January 1, 2021, in the safety of his new Parler community, Sparks advocated for a civil war to redress his political grievances. He made his wishes as explicit as possible: "yes we want a civil war to be clear." Exh. 383.

On January 2, the day after posting about civil war, Sparks bought a .22-caliber heavy barreled semiautomatic rifle and a scope. Exhs. 605, 611. On January 3, 2021, he posted to Facebook, "It's time to drag them out of Congress. It's tyranny." Exh. 335.

Sparks stayed well-informed about Congress's plan to certify the votes of the electoral college on January 6, even posing the question to his Parler community, "If we have to have one person from the house to contest the electoral on the 6 th who will it be[?]" Exh. 383. He spread the news to his Facebook friends that Donald Trump had a "Path to Victory, Starting Jan. 6." Exh.

332. In the article he shared, Lara Trump described that the electoral votes had been sent to D.C. so that, at the Joint Session of Congress on January 6, then-Vice President Pence could open them and read the votes aloud. *Id.* at 2. Because Congress needed to certify the Vice President's count, any member of Congress could object, and, she surmised, if it came down to a vote on those objections, "for whatever reason they decide they will not certify this for Joe Biden and they vote for Donald Trump. Then guess what? Donald Trump remains president of the United States for the next four years." *Id.* at 3. This is the mechanism under which Sparks hoped that the proceeding on January 6 would result in a win for his candidate, despite the fact that his candidate lost the election. In the article Sparks forwarded, Lara Trump called January 6 "the 'date of ultimate significance' for the possibility of a second term" for Donald Trump. The headline described this as "a constitutional path for a Donald Trump victory."

Sparks hooked on to the supposed constitutional underpinnings of this plan, writing, the very same day, "I believe in the constitution so I'll die f[o]r it. Trump is my president." Exh. 333. Just four days before January 6, then, Sparks was prepared to "die" in support of the very process outlined by Lara Trump. The implication is that Sparks knew full well that the "wild" protest planned for January 6 was likely to devolve into violence and chaos. Indeed, he knew that he and other like-minded people might need to "drag them out of Congress"—which he was prepared to do "by th[eir] face if need be." Exhs. 335, 414.

### *Travel to the Capital City*

Sparks made plans to travel to D.C. for January 6 with a group of his coworkers from Elizabethtown, Kentucky. Sparks rented a van so they could all drive up together. His friend (and later, co-defendant) Joseph Howe posted a fundraising effort through GoFundMe, hoping to raise money for the group's travel. Exh. 701. Sparks and Howe procured bullet proof vests and brought

them with them to D.C. for the rally.[3]

On the morning of January 6, Sparks and his group went to the rally at the Ellipse, but they did not enter the restricted area. Sparks and Howe, at least, very likely would not have cleared security to enter, since both were wearing their bullet proof vests throughout the day. *See* Exh. 270 (images of Sparks wearing vest under his clothing on January 6; page 1 shown below).



Sparks was in the audience when then-President Trump took the stage at the Ellipse. He and his group then walked down the National Mall to the Capitol. On their way, Sparks and Howe spoke to someone who was walking near them and livestreaming the events. Exh. 263. With the

---

[3] Sparks disputed at trial that he was wearing a bullet proof vest, but the video and photo evidence clearly showed that he wore a rigid and bulky vest underneath his black outer jacket. And one of their co-workers who traveled to D.C. together with Sparks and Howe and attended the January 6 rally with them told the FBI that he saw both Sparks and Howe "wearing tactical vests" that day.   In his post-plea interview with the FBI, Howe said that he did not see Sparks put his vest on, but he assumed it was a vest that Sparks was wearing.

Capitol building in their sights, Howe said not less than five times, "We're getting in that building." *Id*. at 2:50 – 3:05. Sparks (or someone in their group who sounds like Sparks[4]) added, "All it's going to take is one person to go. The rest is following." *Id.* at 3:07. Howe chimed in, "Let it go south in there." *Id.* Sparks then introduced himself to the cameraman by name and offered his prediction that in the next few hours, then-Vice President Pence would "deem you" four more years of President Trump. *Id.* at 3:30.

Of course, both Sparks and Howe were more right than perhaps anyone else knew at the time—it was just a short time later that Sparks made history as the very first person to go inside, and the rest indeed followed.

### Approach to the Capitol

Once he arrived at Capitol grounds, Sparks saw the battleground between rioters and the police. *See*, *e.g.*, Exh. 207C. Undeterred, he made his way past the barriers, the police attempting to control the crowd with smoke bombs, concussion grenades, and pepper spray, and into the scaffolding structure covering the Northwest Stairs. Inside the scaffolding, another battle raged, and Sparks watched police officers being attacked from all sides by rioters bent on breaking through their lines. Sparks reacted to the concussion grenades by covering his head and ears, but he made no effort to leave. Exh. 210C at 9:00 – 10:10. U.S. Capitol Police (USCP) Special Agent

---

[4] Sparks claims that the conclusion this was his voice "is unsupported by the evidence admitted at trial." ECF 132, at 18. That is incorrect. The case agent was prepared to testify that the speaker was Sparks, but after the defense objected, the question was withdrawn and the jury was asked to draw the conclusion based on comparison to the audio at other points in the same video. Likewise, this Court can easily determine, based on the full video and audio at Exhibit 263, that it was Sparks who said, "All it's going to take is one person to go. The rest is following." Exh. 263 at 3:07. But even if it were not Sparks who said those words, it was someone very near the cameraman and clearly within Sparks's earshot, part of the same conversation with Howe. Sparks and Howe had a mission to "get in that building," which was evidently no surprise to Sparks.

Albert Chow was one of the officers in that battle. As he testified, he rushed to the aid of other officers there, and found a scene of "absolute chaos" where at least one officer was being carried away after suffering an injury to the head. Trial Tr., 2/28/24 at 19 (Testimony of U.S. Capitol Police Special Agent Albert Chow). USCP Officer Eugene Goodman was also in the scaffolding trying to fend off the rioters, and he described it as "like medieval times." Soon enough, the officers were overrun. SA Chow tried to position himself in a doorway to block their advance, but rioters soon attacked him from all sides. *Id.* at 20. Howe ripped SA Chow's shield out of his hands. *Id.* at 24; Exh. 215C at 1:53. Now defenseless, SA Chow was almost immediately tackled from his right flank by other rioters who took advantage of Howe's efforts to disarm him. SA Chow was taken to the ground, hitting the stone steps hard. Someone hit him in the head as he was on the ground. Trial Tr. 2/28/24 at 30. He left the Capitol that afternoon in an ambulance, unconscious, a concussion from blunt-force trauma impact to the head, multiple wounds to his body, and his contact lenses melted to his eyes from the bear spray. *Id.* at 59. SA Chow can still hear the screams of his fellow officers at night. *Id.* at 54.

Sparks was in view of Howe as they progressed through the scaffolding and up the stairs, as Howe attacked more officers with pepper spray, a stolen police baton, and by moving the bike rack barricades that were designed to block the mob's advance. When the rioters broke through the police line at the top of the scaffolding landing, Sparks and Howe were among the first rioters to breach the line and occupy the landing, forcing the officers to retreat further up the stairs. Soon enough, the next police line broke, and Sparks was at the very front, running up the stairs to reach the very last line of defense before the rioters had access to the building. He turned to soak in the scene behind him and rally the mob to follow him to the Capitol building. Exh. 217 (shown below).



At the top of the stairs on the Upper West Terrace, Sparks maneuvered to the front line against the bike racks. Officers were assertively using their batons to strike against the mob and keep people away from the bike racks—but Sparks ignored the baton strikes and pushed the bike racks into the police line. Exh. 219C at 0:47 (excerpted below) and 1:07. The mob quickly overcame that last line of defense and approached the building doors.



Once on the Upper West Terrace, Sparks and Howe found one another and celebrated their victory over the beleaguered police. They embraced in a hug, and Sparks threw his arms in the air. Exh. 221C, at 0:08 (shown below).



Sparks then ran to the first available entrance to the building, the Senate Wing Door, where a group of the most ambitious, violent rioters were banging on the door and smashing the windows. One rioter broke the right window with a 2x4. Exh. 219C at 1:54. Proud Boy Dominic Pezzola

11

used a stolen police shield to smash the left window. *Id.* at 2:16. Immediately after Pezzola's destruction of the left window, Sparks braced himself to jump through the left window, as another rioter did the same on the right. *Id.* at 2:34.

At that moment, USCP Sergeant Victor Nichols, inside the building, responded to the breach. He was alone, looking out at the sea of rioters dressed in battle gear and armor. When the mob saw Sergeant Nichols reach for his waistband, they paused. Someone yelled, "Don't go in!" Exh. 219 at 2:37. The rioter in the right window hesitated, and then retreated. But Sparks, knowing that he had body armor to keep him safe from bullets, was undeterred. Sparks charged through the window and into the building. *Id.* (excerpted below).



Sergeant Nichols approached from inside the Crypt at the same moment. Trial Tr., 2/28/24 at 89. As he described it, when he saw people in ballistic armor just outside the broken window, "I feared for my life." *Id.*; *see also id.* at 116 (describing reaching out to his family via text to tell them he loved them "because I didn't know if I was going to make it home"). The crowd was

agitated and violent; when they saw Sergeant Nichols, someone yelled, "Kill him." *Id.* at 93. Sergeant Nichols had to make a life-or-death choice, whether to draw his firearm or his pepper spray. He saw that the crowd was armed and defended with tactical gear, and if he shot, he would very likely be killed. He chose the pepper spray. *Id.* at 90 ("either I would be shot by someone in the crowd or I would be overwhelmed"). But the spray—which Sergeant Nichols knew from his experience would cause "the worst pain I've ever felt in my life," *id.*—had virtually no effect on Sparks. So determined was Sparks to reach his goal of stopping Congress, Sparks continued straight on and did not even stop to wipe the burning chemicals from his eyes. Exh. 104C at 13:07 – 13:50. By entering through the broken window, ignoring the warnings of other rioters and ignoring Sergeant Nichols's efforts to stop him, Sparks acted "like a green light for everybody behind him, and everyone followed right behind him because it was like it was okay to go into the building." *Id.* at 117. Sergeant Nichols, who confronted Sparks as the building was breached—the only officer to experience this first hand—testified that Sparks's actions "is the catalyst for the building being completely breached." *Id*.

Once inside, Sparks found his way through the hallways that led to the Senate stairs. The Vice President and Senators were in session just one floor above where he entered. They recessed less than one minute after Sparks jumped through the window, when Senate leadership and security officials learned that rioters had entered the building. Exh. 913. Based on the mob's behavior, Sergeant Nichols "believed that they were going to the Senate chamber to interrupt the counting of the electoral votes." Trial Tr. 2/28/24 at 105. He understood that the police on duty that day "could not let them make it into the chamber at all costs." *Id.* at 110.

Sparks and a group of angry rioters—many of them armed, one carrying a sharpened spear, another a Confederate flag—encountered USCP Officer Eugene Goodman at the bottom of those

stairs. Officer Goodman was alone, standing in a doorway, trying to fend off a mob of armed rioters from further penetrating the building. Officer Goodman recalled that the sound was "pretty much deafening. . . . It's [] a lot of people there and they're all yelling and screaming. So it's very, very loud." Trial Tr. 2/29/24 at 61 (Trial Testimony of U.S. Capitol Police Officer Eugene Goodman). The mob accosted him, demanding, "Where they counting the fucking votes? Where they counting them votes at?" *See id*. at 64. Just across the hallway, within plain sight of the rioters, Senators were being evacuated. Exh. 224C.

Officer Goodman commanded the crowd to move back and warned that he would shoot—while his hand rested on his service weapon. Officer Goodman explained that he was "vastly outnumbered and I got a bunch of people in my face yelling obscenities and threatening, and I just felt like that, at any moment, they could just all charge and rush me and overtake me." Trial Tr. 2/29/24 at 71. But even after Officer Goodman sent this unmistakable signal, even after he explicitly warned them that he would shoot, the rioters advanced. Exh. 228C. Alone and outmanned, Officer Goodman stepped backward to retrieve his baton, which had fallen off his belt as he raced downstairs to stop the mob. Once Officer Goodman stepped back, rioters immediately advanced forward. Officer Goodman then began running up the stairs, and the mob, Sparks among them, chased him up the stairs.

The chase ended when Officer Goodman reached the Ohio Clock Corridor, immediately outside the main entrance to the Senate Chamber, where backup awaited in the form of several more USCP officers, including Deputy Chief Thomas Loyd. Chief Loyd immediately ordered the rioters, including Sparks, "Leave now!" Exh. 228C (excerpted below).



Sparks not only refused to leave, he shouted back at the police. Pointing at Officer Goodman, Sparks shouted: "No, we're here for you. We're here for you guys." Exh. 228C. Officer Goodman recalled that Sparks was "very animated, angry, very gesticular in his hand movements, you know, forceful in his own, agitated. Yeah. Angry." Trial Tr. 2/29/24 at 79. Sparks screamed, waving his hands in the air, "This is our America. This is our America." Exh. 228C; *see also* Exh. 232 (shown below). Sparks was one of the rioters who concerned Officer Goodman most out of

the entire group, because "he was the most . . . active. He was one of the loudest[,]" and he pointed his finger and displayed an "in-your-face attitude." Trial Tr. 2/29/24 at 109, 112 (cross examination).



As Sparks screamed, the Senators in the room just across the wall were sheltering in place, waiting for a safe moment to evacuate. USCP Officer Mark Gazelle, had taken charge of the evacuation, struggled to maintain order and calm inside the chamber. Officer Gazelle testified that the Senators could hear the screams of the rioters as they hid. Trial Tr. 2/28/24 at 174-75 (Trial Testimony of U.S. Capitol Police Officer Mark Gazelle).

Sparks remained in the Ohio Clock Corridor, part of the angry, screaming mob of rioters, facing off with the police, for about 10 minutes. Trial Tr. 2/29/24 at 87, 89 (Officer Goodman describing that Sparks continued to angrily gesture and engage officers, and tried to inch forward).

By that time, the police had regained some control, and the temperature in the room cooled. Sparks, likely realizing that he could not breach this last police line, turned around and left the building. At this time, 2:26 pm, the Vice President had just been evacuated—passing through a hallway just yards away from the place Sparks was occupying.

### Sparks Conceals His Role After January 6

After the riot, Sparks was immediately identified as one of the most serious offenders. His friends began to warn him that he was wanted by the FBI. Even in the aftermath of the violence and destruction of the day, when his mother told him he should not have gone inside the Capitol building, he was proud and defended what he had done. On January 7, 2021, he texted her, "I'll go again given the opportunity." Exh. 415. When a friend cheered him on in a text on January 7, 2021, "Merica!!", Sparks responded with pride, "That's right[.]Freedom[.]" Exh. 414 at 3.

Even worse, Sparks began to spread lies and misinformation about what happened. On Parler, he posted an article claiming, "Capitol police literally let the protestors into the building." Exh. 337. To a friend, he claimed that he had seen with his own eyes that the media made up what happened. Exh. 421. He also continued to advocate violence. In a message to one friend, referring to Congressional leaders, he agreed that they were "violent criminals" and said, "Hangem high." Exh. 342.

Sparks also took steps to delete evidence of his crimes before he was apprehended. On January 9, 2021, he posted publicly on Facebook that he had "give[n] up on democracy" and that "[t]his is my last post on Facebook then I'm cancelling my account." Exh. 338. But he did not follow through; his account remained active. Only after he knew he was about to be arrested did Sparks take action—not to "cancel" his account or change the privacy settings to dissuade strangers from making contact, but to permanently *delete* it. Exh. 303 at 4 ("Permanently Deleted

User"). The sequence of events is illuminating: at 12:10 pm on January 18, 2021, Sparks's wife texted him a warning—"hide everything[.]" Exh. 425 (shown below).



She specifically warned Sparks, "make sure you deactivate your Facebook" because "they have Our profile pictures." At this time, Sparks's Facebook page was still active.

But less than two hours later, around 2:00 pm on January 18, 2021, the FBI case agent contacted Sparks directly to let him know that a sealed complaint, sworn out the evening before, was pending and a warrant was issued for his arrest. Sparks agreed to turn himself in the following afternoon. *See* Exhibit A (FBI email[5]). The self-surrender date was set for January 19, 2021, at 1:30 pm. *Id.*

Now aware that his arrest was scheduled for the following day, Sparks quickly took action and followed his wife's advice. That evening, at 7:40 pm,[6] Sparks de-activated his Facebook account and deleted his records. Exh. 303 at 4.

---

[5] This email was sent at 2:07 pm Eastern; the time noted on the exhibit is Pacific time.

[6] Facebook records show that Sparks deactivated and permanently deleted his account at 00:40 UTC, which was 7:40 pm Eastern time.

Unbeknownst to Sparks at the time, however, FBI agents had already taken steps to secure the evidence, and on January 13, 2021, Facebook preserved Sparks's account for law enforcement. *See* Exhibit B (Jan. 13, 2021, email from Facebook to FBI). Because of this, we now know—and the jury was able to assess—the evidence contained in the account before Sparks deleted it.

Sparks also deleted from his cell phone text messages he exchanged with Howe before their contents could be recovered by law enforcement. Sparks and Howe had traded dozens of messages between December 19, 2020, and January 22, 2021. Exh. 427 (listing text records) On January 24, 2021, Sparks turned his phone over to the FBI for search. *See* Exh. 401 (Jan. 24, 2021, consent to search form signed by Sparks). When the FBI accessed the data on Sparks's phone, they could only recover the record of those texts being sent and received, without any content; the forensic image showed that each one had been deleted. Exh. 427. Many text messages with other people *were* recovered from the phone, and the forensic extraction of the device shows that, of the relevant messages within this time period, messages with Howe were the only ones Sparks deleted.[7]

The FBI was unaware of Howe's crimes on January 6. A tipster had informed the FBI that Sparks traveled to D.C. with Howe and a group of other coworkers, no evidence had yet been located suggesting Howe went into the Capitol building with Sparks, nor that he assaulted police officers that day. On April 12, 2021, the FBI interviewed Howe as a witness in Sparks's case. Howe told the agents—falsely—that he walked up the Capitol steps and up to the building, but only looked in the window and never went inside. *See* Exhibit C (Apr. 12, 2021, report of interview

---

[7] Sparks's claim that "he constantly and routinely deletes emails and messages—as do most people—to prevent them building up on his phone," ECF 132 at 18, is thus contradicted by the evidence of other text messages from the same time period found on his phone that were *not* deleted—those with Howe appearing to be the only ones.

with Howe). Only more than a year later did the FBI learn that Howe had been side-by-side with Sparks as they battled their way through the Northwest Terrace and had entered the building right after Sparks.

### Sparks's Statement to the Court

Sparks has never been interviewed by law enforcement about his conduct on January 6, and he did not testify at trial. Sparks did submit a letter to the Court in anticipation of sentencing. ECF 131-1. Displaying no appreciation of the seriousness of the offense or the impact his behavior had on the mob—let alone on the police officers he obstructed—Sparks downplayed his behavior. *Id.* at 5 ("I wanted my voice to be heard in unison with the thousands of good people around me."); *id.* (Outside the building, "I didn't understand that day why the flash bangs etc because no one was going forward around me until it got all riled up. The crowd started going forward and there we went."); *id.* at 6 ("I made sure as I was protesting to make sure to have a level of respect for all involved."). Remarkably, the only "regrets" Sparks expressed is that what he described as a "rally" "did not change anything." He had no regret for his own actions pushing his way through the crowd to the front line, jumping through broken glass, roaming the halls of Congress while lawmakers cowered in fear, or for the impact his actions had on the Joint Session of Congress or country as a whole. Instead, despite hearing the testimony of the officers at his trial and the video evidence alongside his own words, Sparks told this Court that the evidence introduced at his trial was "a total spin of the actual truth of that day." Sparks distorted the reality of his crimes by claiming that the "actual truth" is that he "ended up going into a building and trespassed to be heard."

### III.    THE CHARGES AND VERDICT

On November 9, 2022, a federal grand jury returned a second superseding indictment charging Sparks, along with his co-defendant Joseph Howe, with several counts, including, as to

Sparks, Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One); Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Two); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Ten); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Eleven); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Twelve); and Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Fourteen). On March 1, 2024, Sparks was convicted of these offenses following a jury trial. On August 5, 2024, this Court granted the government's unopposed motion to dismiss Count One.

## IV.    STATUTORY PENALTIES

Sparks now faces sentencing on Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Two), Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Ten); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Eleven); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Twelve); and Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Fourteen).

As noted by the Presentence Report issued by the U.S. Probation Office, Sparks faces up to five years of imprisonment, three years of supervised release, a fine of $250,000, and a mandatory special assessment of $100 for Count Two; one year of imprisonment, one year of supervised release, a fine of $100,000, and a mandatory special assessment of $25 for Counts Ten and Eleven, and six months of imprisonment or five years of probation, a fine of $5,000, and a mandatory special assessment of $10 for Counts Twelve and Fourteen. The defendant also faces a restitution order, as discussed below.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Here, the Guidelines apply to three counts: Counts Two, Ten, and Eleven, and are calculated as set forth next. (Counts Twelve and Fourteen are Class B misdemeanors to which the Sentencing Guidelines do not apply.)

### A.  <u>Count Two</u>: 18 U.S.C. § 231(a)(3)—Obstructing Officers During a Civil Disorder

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Adjustment – Obstruction of Justice | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See argument below.* |
| Total | 12 | |

### B.  <u>Count Ten</u>: 18 U.S.C. § 1752(a)(1)—Entering or Remaining in a Restricted Building or Grounds

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |

| Cross-Reference | 10 | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."<br><br>U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Sparks entered the restricted area of the Capitol building with the intent to obstruct officers during a civil disorder. The substantive offense is thus Count Two, and the base offense level for that offense should be applied. |
| Adjustment – Obstruction of Justice | +2 | U.S.S.G. § 3C1.1: obstruction of justice - *see argument below*. |
| Total | 12 | |

### C. <u>Count Eleven</u>: 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base/Total Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
| Adjustment – Obstruction of Justice | +2 | U.S.S.G. § 3C1.1: obstruction of justice - *see argument below*. |
| Total | 12 | |

### D. <u>§ 3C1.1: Obstruction of Justice</u>

Under U.S.S.G. § 3C1.1, two levels are added to the offense level for each count where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant

offense of conviction" and "the obstructive conduct related to (A) defendant's offense of conviction and any relevant conduct; or (B) a closely related offense[.]" The application notes specify that, among the conduct covered by this adjustment is "destroying or concealing…evidence that is material to an official investigation or judicial proceeding (*e.g.* shredding a document…upon learning that an official investigation has commenced…), or attempting to do so[.]"

Sparks talked about closing his Facebook account after he became infamous, just after his involvement in the attack on the Capitol hit the news. He could have deactivated his account on January 9, 2021, when he broadcast that he would be "cancelling my account." Exh. 338. But he did not. Had he been worried about his or his family's privacy or a deluge of harassment, *see* ECF 132 at 18, he could also have changed his privacy settings. But he did not. Only after his wife warned him to "hide everything" and deactivate his Facebook account, Exh. 425, and an FBI agent called to tell him to report for arrest the next day, did Sparks take action.   Only when Sparks *knew* the FBI planned to arrest him did he actually take the step of deleting the evidence.

That the Facebook records Sparks attempted to destroy and conceal were "material to an official investigation or judicial proceeding" under the Sentencing Guidelines is evident. Sparks's effort to delete the evidence was unsuccessful, because the FBI had, unbeknownst to Sparks, already taken steps to preserve the account. For that reason only, the contents of his Facebook account were recovered, reviewed, and presented to the Court during trial. *See* Exh. 301 – 325. Taken together, his Facebook posts show Sparks's motive for breaking into the Capitol building, his intent in planning and executing his trip to D.C. for January 6, his actions leading up to and inside the Capitol, and his efforts to whitewash what happened after the fact. The Facebook records Sparks deleted provided critical evidence of nearly every element of each of the offenses charged

as well as the relevant conduct relating to Sparks's successful obstruction of the Joint Session of Congress. None of that evidence would have been available to the FBI—or to the jury and this Court—had Sparks's attempt to destroy it been successful.

Sparks also deleted his text messages with Howe—an effort that was more successful and left the FBI unable to recover the missing evidence. While the contents of the messages could not be recovered, the only reasonable inference to draw from the circumstances is that Sparks deleted them precisely because he knew they would provide incriminating evidence against himself and against Howe. As a result, the FBI did not uncover evidence of Howe's participation in the crimes, and Howe was able to conceal his involvement for many months. Howe's lies to the FBI went undetected, and Sparks's obstruction contributed to that failure of the investigation.

Sparks argues that the government must prove the contents of the deleted messages in order to establish his obstructive conduct for purposes of U.S.S.G. § 3C1.1. *See* ECF 132 at 24 ("Without knowing the content [of the deleted texts], then, the government cannot carry its burden."). This is contrary to the plain text of § 3C1.1, which provides for a sentencing adjustment for both *actual* and *attempted* obstruction by attempting to or actually destroying records. That Sparks succeeded in permanently depriving investigators of this evidence, and that he succeeded in throwing the FBI off the trail of Howe for more than a year, does not make his obstructive acts *less* worthy of additional punishment. Furthermore, in light of the timing of the deleted texts—some deleted just days before Sparks agreed to turn his phone over to the FBI for a consent search—in conjunction with his efforts to delete his Facebook records and Howe's lies to the FBI, the only reasonable inference is that Sparks willfully obstructed the investigation by destroying evidence of his conversations with his co-defendant.

## § 3D1: Grouping Analysis

Sparks's offenses fall into two separate groups. Group One, which consists of Count Two, relates to the interference with law enforcement, including Sergeant Nichols, Officer Goodman, and the other USCP officers Sparks obstructed while they struggled to keep the Capitol safe during a civil disorder. The offense level for this group is 12.

Group Two, which includes Counts Ten and Eleven, relates to the obstruction of Congress and Sparks's interference with the functioning of the government.[8] *See* U.S.S.G. § 3D1.2(a) & (b) (counts should be grouped together if they involve the same victim and "the same act or transaction," or "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan"). The offense level for this Group is 12, based on the highest offense level in the group, as both Counts Ten and Eleven result in offense level 12. *See* U.S.S.G. § 3D1.3(a).

Pursuant to § 3D1.4, there are two Units, both with the same offense level, so two levels are added. The total offense level is therefore 14.[9]

---

[8] Sparks takes issue with the grouping rules, and points to Howe's case and others where the counts grouped together. ECF 132 at 21-22. But this is explained by the Guidelines grouping rules themselves. In many cases, the Guidelines for a conviction under 18 U.S.C. § 1512 included an 8-level increase under § 2J1.2(b)(1)(B) because the offense involved causing or threatening injury to a person or property damage and a 3-level increase for substantial interference with the administration of justice under § 2J1.2(b)(2). In Howe's case, as in many others, that was based on the same conduct that formed the basis for his 111(a) conviction, and therefore, under USSG § 3D1.2(c), the 1512 and 111(a) counts group. Here, the two groups do not involve substantially the same harm; the victims of Group One are the police and of Group Two are Congress and the functioning of the government.

[9] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the

## § 4C1.1: Adjustment for Certain Zero-Point Offenders Not Applicable

U.S.S.G. § 4C1.1 does not decrease Sparks's total offense level because Sparks used violence and credible threats of violence in connection with his offenses. As described above, prior to January 6, Sparks posted about dragging lawmakers out of Congress "by their face." He advocated for civil war. He purchased a firearm. On January 6, Sparks wore body armor; predicted that he and Howe would enter the Capitol by force; joined in overwhelming police in the scaffolding and on the Northwest stairs; pushed the bike racks into the police line at the Upper West Terrace; was the first rioter to charge into the building, even overcoming Sergeant Nichols's pepper spray to the face; joined a group of rioters that chased Officer Goodman into the Ohio Clock Corridor; and remained in the hallway just outside the Senate chamber despite officer commands to leave and as senators huddled in fear just across the wall. The PSR thus correctly concludes that Sparks is ineligible for the reduction. PSR ¶ 82. To the contrary, some of this conduct, including Sparks's use of body armor and pushing of bike racks into a police line, is not fully reflected in the guidelines calculations above and may support the imposition of an upward departure or variance in this case, discussed next.

## Upward Departures and Variances

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because the Guidelines range does not capture the unprecedented and uniquely harmful nature of Sparks's crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary

---

grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (*see* PSR ¶ 61) that Counts Ten, and Eleven group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

upwards from the top of the Guidelines range.

Sparks was an avid and willing participant in an unprecedented crime—the one person that Sergeant Nichols described as the catalyst for the entire event. Sparks gave the "green light" to the mob that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in damage to the historic Capitol building. His offense targeted the peaceful transfer of power, an essential government function and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Sparks "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter who played a lesser role in the same Ohio Clock Corridor standoff, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 86-87.

But nothing in Sparks's Guidelines calculation reflects these facts. He would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[10] There is no specific offense characteristic in the Guidelines for

---

[10] The D.C. Circuit's holding in *Brock*, 94 F.4th 39, finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S. Ct. 2176 (2024) demonstrates that the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

attacking democracy or abandoning the rule of law. A sentence within the Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[11] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected." *Id.*

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. Sparks followed his candidate's efforts to challenge the election closely, and he knew that the lawful efforts—and even unlawful but peaceful efforts—to re-count ballots or

---

[11] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

otherwise revise the results had come up short in the courts. He knew, that is, that the election had not been "stolen"—he simply preferred a different outcome, and, along with his fellow rioters, he chose to take matters into his own hands through acts of violence and intimidation. *See United States v. Wyatt*, 23-CR-215-RDM, Sent. Tr. at 44.

Indeed, judges of this Court have already applied § 5K2.7 in January 6 cases. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR127 (ABJ), Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter following his acquittal of 18 U.S.C. § 1512(c)(2)). Because the seriousness of Sparks's crime is not adequately captured by the applicable Guidelines, an upward departure under § 5K2.7 is appropriate.

Additionally, given the dangerous circumstances created by the riot, the Court could depart under Guidelines § 5K2.14 in addition to, or as an alternative to, departing under § 5K2.7. Section 5K2.14 provides for a departure if "national security, public health, or safety was significantly endangered." The assault on the Capitol endangered the safety of the public, police, and elected officials in a way not already captured by the Guidelines range, so a departure under § 5K2.14 would be appropriate. *Cf. United States v. Calloway*, No. 21-3057, 2024 WL 925790, at *3 (D.C. Cir. Mar. 5, 2024) (affirming departure under § 5K2.14 where district court found that the defendant "created a serious risk that multiple individuals could have been killed or injured").

Finally, § 5K2.21(2) provides that "[t]he court may depart upward to reflect the actual seriousness of the offense based on conduct . . . that did not enter into the determination of the applicable guideline range." Here, Sparks was convicted of acting corruptly, conscious that what

he was doing was wrong, to successfully stop the Joint Session of Congress. He did this by breaking into the Capitol building, ignoring police officers who at several levels implored him to stop—including with a direct hit of pepper spray from Sergeant Nichols and the threat by no less than two officers that he could be shot—and making his way within feet of the Senate chamber and the Vice President as he tried to evacuate. While the evidence does not establish that Sparks obstructed the proceeding by taking any action with respect to a document or other physical evidence, the conduct for which he was convicted under Section 1512(c)(2) is no less serious and troubling than it was before the Supreme Court's decision in *Fischer* called that conviction into question by clarifying the elements of the offense. Thus, because the dismissed Count One does not enter into the determination of Sparks's guideline range, it provides an additional basis for an upward departure.

If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed the advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [the defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [the defendant's] sentence . . . would require this Court to take a drastically different view of [his] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)[.]")

In past sentencings, this court has made clear its view that January 6 was a disgrace, an event that damaged the fragile tradition of the peaceful transfer of power that had been an unbroken tradition for our country. *Celentano*, Sent. Tr. 1/30/24 at 98-99. "[I]t was a blow against the customs and practices that help support the rule of law and the constitution." *United States v. Howe*, 21-cr-87-2 (TJK), Sent. Tr. 10/20/2023, at 64. And "it is a miracle there wasn't a greater loss of life and greater injury that day." *Id.* at 66. Those were not empty words—they were a recognition of the seriousness and unprecedented nature of the riot that Sparks helped to set off.

Other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day. *See United States v. Reffitt,* 21-CR-87-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-368-TJK, Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated and the only count of conviction were § 231, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows."). This Court should do the same based on the crimes Sparks committed and the relevant conduct including his efforts to stop Congress from performing its critical constitutional function.

The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as the D.C. Circuit recently explained, for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the *specific* reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. *United States v. Iracks*, 106 F.4th 61, 67 (D.C. Cir. 2024) (alteration and emphasis in original) (quoting 18 U.S.C. § 3553(c)(2)). Accordingly, the government requests that the Court make specific findings that Sparks's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Dawayne Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *United States v. James Brown*, 808 F.3d 865, 867 (D.C. Cir. 2015)).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Sentencing must be guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Sparks's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Sparks planned for weeks for the event, tracked the proceedings in Congress, came prepared for violence wearing body armor, and failed to heed the police

officers' commands even when he was hit directly in the face with pepper spray at close range after jumping through the window at the Senate Wing Door, giving the "green light" to the hundreds or thousands who followed him. The nature and circumstances of Sparks's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 57 months in custody.

### B.   The History and Characteristics of the Defendant

The defendant is a former factory worker who now owns his own landscaping business. He has no criminal history points and only one prior conviction for driving under the influence while he was under 21 years old. But more recently, he had a troubling encounter with the police when he was arrested, in 2007, for domestic assault. The details of the incident are set forth in the PSR, and need not be repeated here. PSR ¶ 92. But it is important to note that the incident resulted in visible injuries, and, while the charges were dismissed approximately six months later, the incident resulted in an emergency protective order and, later, an order of protection. It is clear, then, that Sparks's past is not entirely free from violence and threatening behavior.

Sparks reports that he cares for his mother, who lives next door, and that one of his twin sons suffers from a medical condition that requires quarterly X-rays and treatment. These family obligations do not set Sparks apart from any other defendant to appear for sentencing, and should not form the basis for a lower sentence. It appears that Sparks was a caretaker for his mother and his then-younger sons on January 6, 2021, as well, and that did not prevent him from advocating for a "civil war," purchasing an assault rifle, and calling for the violent ousting of lawmakers from the Capitol. In short, it appears that Sparks has many of the same family obligations and engagements as most Americans, and despite those responsibilities, he chose to engage in his crimes on January 6, 2021, knowing the consequences.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sparks's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. To prevent another January 6 and restore respect for the rule of law, the sentence in this most serious case must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Sparks was one of the most visible and influential members of the violent mob, and his name and image quickly made the news. In response—even after knowing the full horrifying scope of the attack—Sparks expressed pride and a willingness to commit his crimes all over again. Sparks argues that the goal of specific deterrence has already been achieved, even with a sentence of probation, due to the certainty of punishment. ECF 132 at 37. But Sparks himself has cast significant doubt on that conclusion: *after* learning

---

[12]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

that he had been identified and would therefore almost certainly be prosecuted,[13] he defiantly told his mother, "I'll go again given the opportunity." Exh. 415 at 6.

Sparks's encounter with the armed Sergeant Nichols (who opted not to draw his service weapon but instead sprayed Sparks in the face with pepper spray) makes him the rioter with what might be the clearest possible perspective that his entry to the building was unlawful. Nevertheless, he spread misinformation on Facebook, claiming that police officers let the rioters into the building. Exh. 337. Even three years later, as his trial loomed and the anniversary of the attack was recognized, Sparks accused the media of lying about the events of January 6, and he responded to the President's remarks about the seriousness of the event by calling Joe Biden "a treasonous piece of scum."[14] Exhibit D (January 21, 2024 Facebook post).

---

[13] By at least 5:27 pm on January 6, 2021, Sparks knew that he had been caught and identified. At that time, his contact Courtney texted him, "You're on the news!" Sparks replied at 5:40 pm, That's what I heard[.]" Exh. 414 at 2.

[14] These were posted to Sparks's public Facebook account, which Sparks is aware that the FBI reads. According to the PSR (¶ 127), in addition to the public Facebook page referenced here, Sparks maintains social media accounts on at least GETTR, Frank Speech, and Truth Social. GETTR, much like Parler was during its operation, is known to allow for uncensored violent and false rhetoric. The FBI does not have access to Sparks's posts from those accounts.



Even in his letter to this court seeking leniency in sentencing, Sparks fails to acknowledge the seriousness of his conduct and therefore demonstrates his risk of recidivism. *See* ECF 131-1 (describing the evidence introduced at trial as "a total spin of the actual truth of that day" and characterizing his conduct as "going into a building and trespassed to be heard.").

In short, the risk here is real that Sparks would reoffend, and a significant term of imprisonment is necessary to achieve the important goal of specific deterrence to ensure Sparks learns the gravity of his crimes and is prevented from repeating them.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

Nevertheless, as *United States v. Brock* demonstrates, the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. 94 F.4th at 59. The D.C. Circuit acknowledged that the January 6 riot interfered with the Joint Session of Congress, "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Id.* The Guidelines simply do not account for this unique and unprecedented event.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). This Court and other courts in this District have sentenced similarly situated defendants who engaged in similar conduct, and the sentence imposed here should take those cases into account. While no previously sentenced case contains the same

balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.[15]

Douglas Jensen is another highly recognizable face of the January 6 riot who, like Sparks, was one of the first to jump through the broken window at the Senate Wing Door (Jensen followed Sparks inside) and gave chase to Officer Goodman from the first floor to the Ohio Clock Corridor (Sparks followed Jensen up the stairs). *United States v. Jensen*, 21-cr-6 (TJK). Once in the standoff with officers in the Ohio Clock Corridor, Sparks was even more angry and animated than Jensen. Jensen was charged with assaulting a federal officer under 18 U.S.C. § 111(a) for his leading role in the group's pursuit of Officer Goodman; however, Jensen did not strike, push, or otherwise touch any officer. Sparks was not charged with assault; however, Sparks was a participant in the menacing chase of Officer Goodman and the standoff in the corridor directly outside the Senate chamber. Indeed, Sparks—with his "in-your-face attitude"—and Jensen were both among the few rioters who drew Officer Goodman's attention and caused him concern. Trial Tr. 2/29/24 at 112.

Moreover, Sparks's role in the breach of the Capitol itself eclipses Jensen's. It was Sparks who was the first to breach the Capitol. And Sparks envisioned his entry well before he jumped through that window—Sparks announced on his way to the grounds that "All it's going to take is one person to go. The rest is following." Exh. 263 at 3:07. Sparks rampaged through the broken window even as Sergeant Nichols pepper sprayed him. Sparks did not stop. Just as Jensen forced Officer Goodman to make a life-or-death choice whether to draw his service weapon, Sparks

---

[15] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

forced Sergeant Nichols into the same impossible dilemma. And, unlike Jensen, Sparks came prepared wearing body armor, fortifying his resolve against the threat that he might be shot. Just as he had envisioned, Sparks emboldened the mob behind him to follow him into the building when they saw that he entered safely and the police were unable to stop them.

And Jensen did not engage in the same careful planning and preparation that Sparks did. Sparks called for "civil war" on social media in the days before January 6, and purchased a semi-automatic firearm. He came to the Capitol wearing body armor. While Jensen told a friend that their group was "locked and loaded" with pistols, no evidence suggests that Jensen brought firearms to the Capitol (though he did carry a 3" folding knife that he described and provided to investigators). In fact, Jensen turned himself in the next day and agreed to a lengthy voluntary interview with the FBI. He provided consent to search his phone and social media—but unlike Sparks, Jensen did not delete evidence before providing it to the FBI. Ultimately, neither Jensen nor Sparks expressed remorse or accepted responsibility for their actions. But Jensen presented unique and compelling mitigation based on his background that helped explain his motivations and his susceptibility to QAnon theories. This Court sentenced Jensen to 60 months in custody.[16]

---

[16] Like Sparks, a jury convicted Jensen of Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), but Jensen's conviction remained intact at sentencing (which occurred before the Supreme Court decided *United States v. Fischer* and before the D.C. Circuit decided *United States v. Brock*). This Court determined that Jensen's Guidelines Offense Level was 25. *United States v. Jensen*, 21-cr-6 (TJK), Sent. Tr. 12/16/22 at 16. Jensen has filed a notice of appeal, and, in light of the changes in the law governing both his conviction and his sentence, this Court may have occasion to review that sentence. Based on this Court's careful assessment of the § 3553(a) factors in that case, in particular the extraordinary nature of the offense and the failure of the Guidelines to adequately account for the nature and circumstances of Jensen's conduct in the context of January 6, Jensen's 60-month sentence remains sufficient but not greater than necessary to achieve the goals of sentencing. Indeed, at Jensen's sentencing hearing, after ruling on disputed Guidelines adjustments, the Court noted:

I'll also just say in this case, I don't think it really matters that much because the

A comprehensive evaluation of all factors—including the two defendants' respective plans and preparation for January 6, aggravating and leadership conduct on January 6, and post-January 6 conduct including Jensen's mitigation—leave Jensen and Sparks remarkably closely situated for sentencing purposes. The government recommends a slightly lower sentence here only to account for Jensen's conviction for assault. But like Jensen, Sparks unquestionably resisted, opposed, impeded, intimidated, and interfered with Officer Goodman in the Ohio Clock Corridor, *and* in addition, with Sergeant Nichols at the Senate Wing Door window. Jensen's assaultive behavior as he approached and advanced on Officer Goodman warrants a measure of distinction, but only a modest one, as Sparks's role in leading entry into the building served the same purpose in animating the mob to advance on the Capitol building itself. A 57-month sentence for Sparks would appropriately account for their differences; any less would create undue disparity between these exceptionally similar defendants.

This Court also sentenced brothers Jerod and Joshua Hughes—two more of the first 10 rioters to enter the building on Sparks's heels—who also took part in the standoff at the Ohio Clock

---

reality is, on the facts here, given the array of conduct here and given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward – even if this didn't apply, I would vary upward when considering the nature of the offense the same amount that this guideline would have me add to the offense level. It doesn't mean I might not vary downward based on other 3553(a) factors even below that, but in looking at the nature of the offense, I would vary upward the same way the guideline would operate even if, as some – in some technical way, it didn't apply.

*Id.*; *see also United States v. Fonticoba*, 21-cr-368 (TJK), Sent. Tr. 1/11/24 at 66–67 (noting that if, after *Fischer*, the defendant's § 1512 conviction were invalidated and § 231 were the only conviction, "I would vary upward significantly…, because I think there, again, given the evidence here of the …the intent to obstruct the proceeding and the nature of the proceeding itself is so important and so critical in terms of deterrence and all the rest…[,] that that would be my sentence").

Corridor. *United States v. Hughes, et al.*, 21-cr-106 (TJK). While the Hughes brothers understood the risk of violence before arriving in D.C., they did not call for violence or celebrate it themselves, unlike Sparks who called for lawmakers to be dragged out of Congress "by their face" and expressed his desire for civil war both in writing and, perhaps, in his purchase of an assault rifle in the days immediately before the riot. Both Hughes brothers also turned themselves in when they arrived home in Minnesota after the riot. Like Sparks, Joshua Hughes destroyed evidence from his phone before providing it to the FBI, but unlike Sparks, he fessed up and told the FBI in January 2021 that he had done so. Also unlike both Sparks and Jensen, the Hughes brothers accepted responsibility, acknowledged and showed remorse for the great harm their crimes caused, and pled guilty. Joshua also "marshaled an unusually impressive array of letters of support from the community." *Id.*, ECF 107 at 8. This Court sentenced Joshua to 38 months in prison, *id.*, ECF 94,[17] and Jerod—who destroyed government property when he kicked open the Senate Wing Door to allow the flood of rioters to follow him—to 46 months in prison, *id.*, ECF 99. Sparks's failure to accept any responsibility, his additional acts of obstructing police officers during a civil disorder, his planning and advocating for violence before January 6, and his destruction of evidence after the fact all require a more significant sentence in this case.

 Sparks's sentence must also take account of the sentence imposed on his co-defendant Howe. While they traveled together, sported their bullet proof vests together, approached the building together and together spoke to the cameraman who questioned Howe's confident assertion that, "we're getting in that building," their conduct at the Capitol itself is different,

---

[17] On July 1, 2024, this Court reduced Joshua Hughes's sentence to 33 months based on his eligibility for a sentence reduction under U.S.S.G. § 4C1.1, which was enacted after Joshua Hughes's 2022 sentencing hearing. *Hughes et al.*, ECF 107. For the reasons discussed above, § 4C1.1 does not apply here.

making a direct comparison impossible. Sparks alone bears the distinction of being first—and here, that matters; as Sergeant Nichols testified, he gave those behind him the "green light." On the other hand, Howe assaulted police officers on his way up the Northwest stairs, including SA Chow, who was attacked by other rioters after Howe violently stole his shield; Howe also deployed pepper spray and procured a police baton. But Sparks was within view of all of this and took advantage of the violence of others in order to advance. Sparks himself pushed up against the bike racks at the top of the stairs, and celebrated with Howe when they reached the building's threshold. Together, they ran toward the entrance and witnessed rioters smashing the window. Sparks did not break anything himself, but he immediately capitalized on the destruction by jumping through the window as soon as it was smashed. Critically, unlike Sparks, Howe took responsibility for his crimes, pleading guilty to obstruction of Congress in violation of 18 U.S.C. § 1512(c)(2) and assault on a federal officer in violation of 18 U.S.C. § 111(a). The government recommended a sentence of 57 months for Howe, and this Court imposed 50 months in custody. ECF 82 (Howe Judgment).

The sentence imposed for Sparks should be higher than Howe's to account for his unique role as the "catalyst" for the attack on the Capitol building, his unflagging lack of any acceptance of responsibility or remorse, and Sparks's lengthy planning and proselytizing for the event including his call for "civil war." Sparks's crimes, although he avoided direct assaults on law enforcement at the Capitol, have a lasting impact worthy of a significant sentence in this case.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Sparks was convicted of a violation of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664). Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*,

926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[18]

Because Sparks engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Sparks to pay $2,000 in restitution for his

---

[18] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

convictions on Counts Two, Ten, and Eleven. This amount fairly reflects Sparks's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Sparks's convictions subject him to a statutory maximum fine of $250,000 on Count Two, $100,000 on Counts Ten and Eleven, and $5,000 on Counts Twelve and Fourteen. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months in custody, three years of supervised release, $2,000 in restitution, and a mandatory special assessment of $170. Because this sentence reflects a departure or variance above the Guidelines range, the government further requests that the Court support its sentence with written findings that Sparks's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range consistent with the D.C. Circuit's ruling

in *United States v. Brown*, 892 F.3d at 404–05.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     _____

EMILY W. ALLEN, Cal. Bar No. 234961
SONIA MITTAL
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
(619) 546-8266